GUINEY vs. MILLER, MISC 19-000413

































 
 MATTHEW GUINEY, Plaintiff, v. STANLEY J. MILLER, individually, THOMAS M. BARRY, in his capacity as the Building Commissioner and Zoning Enforcement Officer for the Town of Norwell, and the TOWN OF NORWELL, Defendants
 MISC 19-000413 
 AUGUST 2, 2021
PLYMOUTH, ss.
RUBIN, J.
DECISION














 In this case, Plaintiff Matthew Guiney ("Guiney") asks the court pursuant to Chapter 240, § 14A, whether a neighboring property owned by Defendant Stanley Miller ("Miller") is entitled to the benefit of a so-called "single lot exception" under the Town of Norwell Bylaw. In practical terms, an affirmative answer would mean that Miller could build a new house on his vacant property across a private way from Guiney's property with a 30-foot setback from that way, instead of a 50-foot setback. Miller has challenged Guiney's standing to proceed with this case, arguing for a number of reasons that Guiney will not be impacted in any way by the construction of such a house. Primarily, Miller contends that his property is located so substantially below the elevation of Guiney's property that a house would not be readily visible, nor would Guiney's privacy be impacted in any meaningful way.





 Trial on the sole issue of standing was held on February 22 and 23, 2021, reserving resolution of the zoning question to a later date, if necessary. A view of the two properties and the neighborhood took place on February 12, 2021. After receipt of transcripts and the filing of post-trial memoranda from both Guiney and Miller, I took the matter under advisement. I conclude that the Guiney's use of his property would indeed be directly and adversely affected by Miller's construction of a house with a setback of thirty feet from Harbor Lane and accordingly has standing to proceed with this case. 





FACTS 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, my view of the properties and the neighborhood, and my assessment as the trier of fact of the credibility, weight, and inferences to be reasonably drawn from the evidence admitted at trial, I make factual findings as follows: 





The Guiney Property and Neighborhood. 





1. Guiney is a co-owner of property known as 42 Harbor Lane, Norwell, by deed dated February 13, 2015, and recorded with the Plymouth County Registry District of the Land Court ("Registry"), at Book 607, Page 153, Certificate of Title No. 121553 (the Guiney Property"). SOF, ¶ 1. The Guiney Property is part of the Harbor Lane Subdivision and appears as Lot 27 on a 1979 definitive plan entitled "Subdivision Plan of Land in Norwell, MA. Loring H. Jacobs, Co. Surveyors, February 16, 1979" and recorded in the Registry at Plan No. 31166E, filed with Certificate of Title No. 37726 ("Harbor Lane Subdivision Plan"). SOF, ¶ 4; Tr. Ex 8. Guiney lives there with his wife and three children. 





2. The Guiney Property includes approximately 1.78 acres of land with a two-story single-family, colonial-style home. The home was built in 1984 and contains approximately 3,400 square feet. SOF, ¶ 5. 





3. Harbor Lane is a private road with a layout width of fifty feet, as shown on the Harbor Lane Subdivision Plan. Harbor Lane generally runs in a north-south orientation as it leaves Main Street and travels south past the Guiney Property and the Miller Property. SOF, ¶¶ 6, 7; Tr. Ex. 8. 





4. The front of the Guiney house faces northeasterly looking up Harbor Lane toward Main Street and not directly across Harbor Lane where Miller's property is located. An expansive front lawn slopes down toward Harbor Lane. Tr. Exs. 8, 10, 11. 





5. Although the front façade of the Guiney house is the dominant façade with many windows and a long profile, it is the narrower southern side of the Guiney house and the adjacent outdoor space that looks east and faces the Miller property that gives rise to this dispute. The outdoor space adjacent to the southern façade of the house is the only flat area of the Guiney Property (the "Side Yard") and faces Harbor Lane and the Miller Property. It is in the Side Yard that the Guiney family recreates when whether permits. 





6. Three rooms of the Guiney house have windows on the southern side facade adjacent to the Side Yard: a living room and family room on the first floor and a single narrow window in the master bath above the bathtub on the second floor. 





7. The portion of the Side Yard that is closest to the Guiney house includes a patio area/pool deck surrounding a generally oval swimming pool, as well as a grill, outdoor shower, lawn chairs, and outdoor music speakers. Across a grassy lawn and further from the Guiney house, a combined swing set, slide and fort ("Swing Set") are located closer to Harbor Lane and the Miller Property. The family uses the Side Yard to recreate and entertain friends and family. Activities include swimming, grilling, sunbathing, playing games and outdoor dining and the like. Tr. Exs. 13(a)-(d), 15(a)-(c), 16(a)-(e), 20(g), and (l). 





8. The Side Yard ends just at the layout of Harbor Lane where the Guiney Property is bounded by a chain link fence. Although the layout of Harbor Lane is fifty feet wide, only approximately half of the layout lying furthest away from the Guiney Property (and abutting the Miller Property) is a paved travelled way. The other portion of the layout of Harbor Lane, as it abuts the Guiney Property, is covered in grass and underbrush and slopes downhill, relatively steeply toward the flat paved travelled way of Harbor Lane. Tr. Exs. 8, 15(d)-(i), 16(i)-(j), 19(a). 





9. Just past the Swing Set, a few pine trees are located and a chain link fence surrounds the Side Yard. The Guiney Property ends at the fence. The land then slopes down toward Harbor Lane. 





10. A person standing near the side façade of the Guiney house and looking east toward Harbor Lane and the Miller Property, can just barely see Harbor Lane because the grade drops sharply after the Guiney fence. Very little if any portion of the Miller Property is visible if one is stand immediately adjacent to the Guiney house. From that vantage point one sees the Swing Set, the fence and underbrush and trees along the boundary between the Guiney Property and the layout of Harbor Lane, and then in the distance more trees and the North River. There is more visibility in wintertime than during the summertime. Tr. Exs. 13(b)- 13(d) [Note 1], 16(b)-(c) 





11. A person standing in the Guiney Property closer to the Swing Set and fence in the Side Yard and looking east, does see portion of Harbor Lane and the Miller Property. From this vantage point, one looks across Harbor Lane, then across the Miller Property, then across Kings Landing Way toward some trees. Further away, but still visible in between trees, is the North River. As one moves from the side façade of the Guiney house toward the Swing Set and then closer to the fence (and the boundary between the Guiney Property and the layout of Harbor Lane), more and more of the Miller Property is visible. Tr. Exs.15(d)-(i); 16(a)-(j); 20(a), (d), (e), (g), and (l). 





12. During the daytime, the portions of the Side Yard closer to the side façade of the Guiney house in the vicinity of the pool are quite private because the Side Yard is elevated above Harbor Lane and because the boundary with the Guiney's neighbor to the south at 50 Harbor Lane is elevated and heavily wooded. Tr. Exs.13(c); 1 (a)-(b); 16(a)-(c), 20(d), (e), and (g). 





13. During the nighttime, the Side Yard is quite dark because there are no streetlights on Harbor Lane or Kings Landing Way. Lights from two other houses on Harbor Lane are visible as points of light at a distance in the darkness. Tr. Ex. 21. 





14. From inside the Guiney house, the rooms overlooking the Side Yard provide little visibility of the Miller Property because of the drop in elevation and intervening trees, underbrush, fence, trees, and swing set. Tr. Exs. 17(a)-(d). 





15. In 2018, Guiney and his wife began to plan substantial improvements to the Side Yard (such as a pergola, expanded eating area, and hot tub). They put their plans on hold because of concerns that occupants of a newly constructed house on the Miller Property would be able to observe their family and friends recreating in the improved Side Yard. 





The Miller Property and Initial Development Efforts. 





16. The Miller property is directly east of the Guiney Property across Harbor Lane, with an address of 43 Kings Landing Way (the "Miller Property"). SOF, ¶ 2. Miller owns this property by deed dated May 27, 2003 and recorded with the Registry at Book 25256, Page 350. SOF, ¶ 2. 





17. The Miller Property is a triangular shaped parcel located at the intersection of Harbor Lane and Kings Landing Way. The lot is narrow at the intersection and then widens. Access to the Miller Property is not available from Harbor Lane, which is part of the Harbor Lane Homeowners' Association. Instead, access is available from Kings Landing Way. 





18. Miller has been trying to build a house on his property for some time. Miller bought the property in 2003 when he lived in Norwood, but has since relocated to Virginia and no longer hopes to live in a house built on the Miller Property. Instead, Miller has been marketing the property for sale. 





19. On May 3, 2017, counsel for the Town sent a letter to Tom Barry, the Norwell Building Commissioner and Zoning Enforcement Officer ("Barry"), responding to an inquiry as to whether the Miller Property was entitled to the benefit of the single lot exemption under Chapter 40A, § 6 of the General Laws and § 1650 of the Bylaws. That letter opined: 





 "Based on my review of the titles to the subject property and the abutting parcels of land, provided the parcel of land complied with the minimum dimensional requirements in 1965 when the lot remained after the conveyance a substantial parcel of the property to the Town of Norwell on December 10, 1965, the lot would be entitled to this single lot exemption sometimes knows as a 'residential lot of record.'" SOF, ¶ 8; Tr. Ex. 6.





20. On June 26, 2017, Barry issued to Miller a "Zoning Interpretation" letter, stating that a house on the Miller Property would be "exempt from the 50' setback requirement from Harbor Lane because it is grandfathered under M.G.L. c. 40A, § 6, fourth para. and s. 1650 of the Norwell Bylaws." In other words, a house on the Miller Property "would not need a 50' setback from Harbor Lane and the current plan is acceptable for the purpose of zoning and application for a Building Permit". SOF, ¶ 9; Tr. Ex. 7. 





21. On October 16, 2018, Miller secured an Order of Conditions from the Norwell Conservation Commission for the siting of a "Single -Family Home w/Driveway, Septic & Grading," which is recorded with the Registry at Book 51011, Page 91 ("Order of Conditions"). The Order of Conditions was issued based on and referred to a Site Plan (SE52-1103 Overlay)," prepared by Merrill Engineers and Land Surveyors, dated August 19, 2016 and revised September 12, 2018 (the "Merrill/Con Com Plan"). SOF, ¶ 10; Tr. Exs. 2, 4. 





22. On September 9, 2019, the Board of Health approved Miller's Application for a Disposal and Construction Permit for new construction of a single-family dwelling with complete septic system on the Miller Property, based on the Merrill/Con Com Plan. Tr. Ex. 5. 





23. Miller engaged Gregory Morse ("Morse") and his company Morse Engineering Co., Inc. to undertake survey and engineering work in connection with the septic system installation. 





24. In or about July 2019, Miller cut down most of the trees on his property and cleared the site to install a septic system. The septic system was installed in September and October 2019, its final inspection was approved on October 12, 2019. Tr. Exs. 5, 10, 14(a)-(d). 





Proposed House on Guiney Property 





25. Renderings prepared for Miller of a proposed house on his property show a two-story house with a third floor (basement and garage) below grade. Tr. Exs. 3a-3c. According to Miller, these renderings were prepared just to see what could be built on the site and utilize a T shaped footprint. That T-shaped footprint was later modified and reduced to come up with the footprint of the foundation depicted on the Merrill/Con Com Plan and approved by the Conservation Commission, as discussed below (the "Miller Foundation"). 





26. A potential purchaser also recently prepared an image or drawing reflecting the house that purchaser would like to build on the Miller Property. This newer image utilizes the Miller Foundation but shows only the front façade of a proposed new house and does not include sufficient detail to evaluate how views from such a house might impact Guiney's use of his property. Tr. Ex. 22. 





27. Brad McKenzie ("McKenzie"), a licensed and experienced civil engineer provided expert testimony on behalf of Guiney. McKenzie prepared a Sight Lines Plan, dated April 28, 2020, showing the Guiney Property, Harbor Lane and the Miller Property with a house sited on the Miller Foundation (the "McKenzie Plan"). McKenzie prepared this plan based on an onsite instrument survey of Harbor Lane and the Guiney Property. Because McKenzie did not have access to the Miller Property, he utilized the Merrill/Con Com Plan to locate structures, data and elevations on the Miller Property and confirmed the accuracy of his data by locating structures on the Merrill/Con Com Plan. Tr. Exs. 2, 9. 





28. The McKenzie Plan includes both a Plan View (from overhead) and a Profile View (a side view), showing the location and topographical elevation of the Guiney Property and related structures, the location and elevations of the Miller Property and proposed house, Harbor Lane, and the relationship from one to another. Tr. Ex. 9. 





29. As shown on the Merrill/Con Com Plan, and replicated on the McKenzie Plan, the bottom of the basement slab of a proposed house on the Miller Property would be located at Elevation 21 feet [Note 2], the top of foundation at Elevation 29 feet and the finish grade of the yard around a house at Elevation 26 feet. 





30. In order to calculate the height of the each of the two above grade floors of the proposed house on the Miller Property, McKenzie testified regarding typical construction practices for residential dwellings and provisions of the Town Bylaws (such as the height limit for structures in residential districts measured from a finish grade of 34 feet). Using these calculations, which I find to be accurate and reasonable, the elevation of the first finished floor of the proposed house would be 30.2 feet approximately and the elevation of the second finished floor would be 40.2 feet approximately. Morse confirmed this building envelope and elevations. [Note 3] 





31. Once the elevations of the first and second floor of a proposed house on the Miller Property are calculated, it is possible to compare those elevations to the elevations of the Guiney Property and his house across Harbor Way to determine whether the Guiney family would be observable from inside a proposed new house on the Miller Property. 





32. According to the McKenzie, whose testimony I credit because of its technical detail, his forthright responses during cross-examination and corroboration of its essential points by Miller's expert witness Morse, the Guiney Side Yard is at Elevation 45. The fence on the boundary line is at Elevation 42 and the grade slopes the downward toward Harbor Lane, which is Elevation 27. There is a fifteen-foot drop from the Side Yard to Harbor Lane. Tr. Ex. 9. 





33. Under current conditions, before the final grades are set for a house on the Miller Property, all that is observable by a person standing on the Miller Property looking up towards the higher elevation Guiney Property are the tower portion of the Swing Set, the sloping upward grade, trees, and the roofline of the Guiney house. From that vantage point, the ground of the Side Yard is not visible, but it is possible to see into the single second floor window on the south façade of the Guiney house, which is where the master bathroom is located, if no shade or window covering was used. However, because the Miller Property is now cleared and was graded for the septic system installation, the current elevation of the ground is below the final, finish grade that would be installed along with construction of a house. I conclude it is unlikely that someone would be able to see into the Side Yard from the yard of the Miller Property once finish grading is in place, although the bathroom would be visible as noted above. [Note 4] Tr. Exs. 19(a), (c), (d), (f)-(k); 20(b), (c), (h)-(j). 





34. The McKenzie Plan also depicts a visual corridor or "Cone of Vision," depicting what would be observable by a person standing inside the second floor of a house on the Miller Property looking through a window toward the Side Yard. Based on this plan and the testimony related thereto, I conclude a proposed residential dwelling on the Miller site, if constructed in accordance with typical construction practices regarding foundation heights, framing between floors and the like would permit occupants on the second floor of that dwelling to see people recreating in the entirety of the Side Yard. Although there are some trees that would obstruct intermittent portions of the view from this vantage point, the trees do not obstruct the entirety of the view in part because the trees are by and large evergreen pines with the trunks alone serving as obstructions. 





35. Even though the ground itself or the surface of the water in the swimming pool might not be viewable from the second floor of a house on the Miller site, the siting of the Miller foundation does permit visual access from the second-floor windows of the Miller house. In part, this visual access is possible despite the change in grade because the Guiney Property slopes toward Harbor Lane after it passes the fence. As such, the visual corridor from the second-floor window of the proposed house on the Miller site does not look out at a perpendicular cliff to a higher plateau, and instead looks out toward an uphill slope and the sloped hillside permits visibility in the area of the Swing Set closest to the fence up to about knee level and increasing to a height of about three feet above ground level near the pool and lounging area. As such, people would be visible recreating, grilling, and walking about from the second floor of the Miller house. 





36. Although a majority of the foundation the Miller house of sits south of the Guiney Property line, were it to continue in a straight line across Harbor Lane, this siting does not prevent visibility of the Guiney Side Yard from inside a house on the Miller Foundation because a person inside the house can easily turn their head to look toward the Side Yard. Likewise, although the position of the proposed house on the Miller Property is angled somewhat from the position of the Guiney house, a person inside the former can simply turn his or her head to look out onto the Side Yard and into the windows of the Guiney house. 





37. In addition, some limited visibility of people recreating in the Guiney Side Yard would also be visible from first floor of a house on the Miller Foundation about three feet off the ground, particularly if the viewer were a taller person in the range of six feet tall. Although the surface of the water in the pool and the surrounding patio would not be visible, people sitting, walking and like would be visible above three feet off the ground. 





38. Some light from a house on the Miller foundation would be also visible from the Guiney Side Yard. The amount is hard to determine at this point without an actual design of a house and lighting. For instance, I find that the headlights of a car traveling up the Miller driveway from Old Kings Landing during the nighttime would be visible from the Guiney Side Yard, more so if one was a person in that yard was standing closer to the fence than closer to the house and lounging area. 





39. Some lights are visible now from other homes on Harbor Lane and Old Kings Landing, but those lights are minor. It is unclear how much additional light would be shed by a house on the Miller Foundation and whether much, if any, of that light would intrude into the Guiney Property. 





DISCUSSION 





 The question before the court at this juncture is whether the location, height, setback, and overall massing of a proposed house constructed on the Miller Foundation will have a direct and adverse impact on the plaintiff so as to establish standing pursuant to Chapter 240, § 14A. That statute permits an abutter to bring a petition in the Land Court for determination as to the validity of a municipal ordinance or bylaw concerning land other than his own in the limited circumstances where the proposed use on that other land has a direct effect on his property. Fitch v. Bd. Of Appeals of Concord, 55 Mass. App. Ct. 748 , 753-54 (2002); Mastriani v. Building Inspector of Monson, 18 Mass. App. Ct. 989 , 990 (1985). Chapter 240, § 14A requires the feared use must be likely, not hypothetical or theoretical. Frost v. Percelay, 20 LCR 454 , 457 (2012) (Misc. Case No. 08 MISC 379983) (Long, J.); See Hansen & Donahue, Inc. v. Town of Norwood, 61 Mass. App. Ct. 292 , 298 (2004). While Miller's proposed development is quite likely and not hypothetical, there still must be a provable, adverse effect on the use, enjoyment or development of the neighbor's land. Frost, 20 LCR at 458; See Tymoczko v. Three County Fairgrounds Redevelopment Corp., 24 LCR 100 , 105 (2012) (Misc. Case No. 10 MISC 442058) (Speicher, J.). 





 I first address Guiney's primary concern, that of a loss of privacy. In that regard, I consider the location of the proposed house on the Miller Property and the lines of vision from the Miller Property to the Guiney Property. In his trial testimony, Miller was emphatic in stating that it would not be possible for a person on the Miller Property or inside a house constructed on the Miller Foundation to see the Guiney family or their friends while recreating in the Side Yard. Miller gave three reasons in support of this conclusion: (1) the Guiney house and Side Yard would not be visible because located at a much higher elevation and across Harbor Lane than the proposed Miller house; (2) trees and foliage shield the Guiney house and Side Yard; and (3) the proposed Miller house is located south of the Guiney southern boundary and at an angle further impeding visibility. 





 After considering the evidence and taking a view of the two properties and neighborhood, I conclude that each one of these theories was disproved by Guiney. To the contrary, as discussed below, the engineering analysis presented by the McKenzie Plan make it abundantly clear that people situated inside a house constructed on the Miller Foundation would be able to see activities in the Side Yard and into at least one and possibly more of the windows of the rooms facing the south façade of the Guiney house. The Guiney family would lose some of their privacy if such a house were constructed. This loss of privacy constitutes a direct and adverse impact and provides standing to Guiney to seek the court's determination under Chapter 240, § 14A.





 The McKenzie Plan includes both a Plan View from above and a Profile View from the side view. The Profile View is particularly instructive and depicts the topographical elevation of the Guiney Property and related structures, as well as the topographical elevation and location of the Miller Property, the proposed house, Harbor Lane, and the relationship from one to another. Tr. Ex. 9. During trial, McKenzie testified credibly and convincingly, aided by the McKenzie Plan, that the elevation of the first finished floor of the proposed house on the Miller Foundation would be at or around 30.2 feet, while the elevation of the second finished floor would be at or around 40.2 feet. Morse, who testified on behalf of Miller, eventually confirmed and conceded to this building envelope and those elevations in his own testimony. As noted above, I credit McKenzie's testimony that the Guiney Side Yard is at an Elevation 45 feet, the fence on the boundary line is at Elevation 42 feet and that Harbor Lane is Elevation 27 feet. 





 The McKenzie Plan also establishes that a proposed residential dwelling on the Miller Foundation, if constructed in accordance with typical construction practices, would permit individuals on the second-floor level of the proposed house to look out upon the entirety of the Side Yard. In addition, trial testimony by McKenzie, also demonstrated that from the vantage point of a standing position on the first floor of the proposed Miller house it would be possible to view people recreating on the Guiney Property. While the surface of the Guiney pool and the surrounding patio would not be visible from this vantage point, it would be possible to observe people sitting, walking and generally recreating from an elevation starting at approximately three feet above the ground. On cross-examination, Morse also conceded that it was likely that a person of six feet in height standing inside a house constructed on the Miller Foundation and looking through windows of both the second and first floors could see people recreating in the Side Yard, even though they would not be able to see the surface of the pool water. 





 I note that my finding that the Guiney Side Yard would be visible to people inside a house constructed on the Miller Foundation is not entirely intuitive given the higher elevation of the Guiney Property. However, once careful consideration is given to the engineering analysis of McKenzie, it becomes clear that visual access occurs despite the change in grade because the Guiney Property slopes downward toward Harbor Lane after it passes the fence. As such, the visual corridor or Cone of Vision from the second-floor window of the proposed house on the Miller site does not look out at a perpendicular cliff to a higher plateau, but rather looks out toward an uphill slope and the sloped hillside permits visibility in the area of the Swing Set closest to the fence up to about knee level and increasing to a height of about three feet above ground level near the pool and lounging area. As such, people would be visible recreating, grilling, and walking about from the second floor of the Miller house. On cross-examination, Morse acknowledged that visibility of the Side Yard from a house on the Miller Foundation was enhanced because the grade sloped uphill from the Miller Property and toward the Side Yard after crossing Harbor Lane. 





 With respect to Miller's contention that the trees and foliage shield the Guiney house and Side Yard, the photographic exhibits, and my observations during the view in the wintertime make it clear that there would only be a partial shielding. Although there are some tree trunks that would obstruct intermittent portions of the view from the vantage point of the proposed Miller house, those trees do not obstruct the entirety of the view, in part because the trees are by and large evergreen pines with the trunks alone serving as obstructions. Miller's third contention that the siting and orientation of his proposed house (somewhat more southerly and oriented at an angle from the Guiney Property) would provide privacy fares no better. Again, based on and with the benefit of the McKenzie Plan, engineering analysis and testimony, I conclude that although the majority of a house of the Miller Foundation sits south of the Guiney Property line, this siting does not prevent visibility into the Guiney Side Yard. The McKenzie Plan and accompanying testimony clarify that a person inside the proposed house on the Miller Foundation need only turn their head to look toward the Side Yard to gain visibility. Likewise, while the position of the proposed Miller house is positioned slightly at an angle from that of the Guiney house, the Guiney's Side Yard would still be visible. Here again, a person inside a house constructed on the Miller Foundation could simply turn his or her head to look out onto the Side Yard and into the windows of the Guiney house. In sum, Guiney has established that he and his family and friends will lose some of their privacy if a house is constructed on the Miller Foundation. This loss of privacy would have a direct and adverse effect on their use and enjoyment of their home. 





 I now turn to the Guiney's contention that light will intrude onto his property as a result of the construction of a home on the Miller Property. At trial, Guiney testified that when his family first moved into their home in 2015, before the Miller Property was cleared, no homes were visible up and down Harbor Lane from the Side Yard during the day and no lights were visible during the nighttime. I discount this testimony and find, based on the photographic exhibits and my view of the property, that Guiney overstated the family's privacy and total absence of light intrusion. I find that Guiney liked having a treed lot across Harbor Way before Miller cleared his lot and has been unhappy since the clearing. For instance, Guiney testified that he now has an almost full view of traffic on Kings Landing Way headed to Bulman Marina, along with an increase in windshear and noise and artificial light and note that Guiney's requests for relief in this lawsuit do not extend to precluding Miller from clearing his lot.





 I do find, however, that some light associated with a house constructed on the Miller Foundation would be visible from the Side Yard in the nighttime. Under existing conditions, the Side Yard is quite dark during the nighttime. There are no streetlights on Harbor Lane or Kings Landing Way. Lights from two other houses on Harbor Lane are visible only as points of light at a distance in the darkness. In contrast, for instance, were a house to be constructed on the Miller Foundation, the headlights of a car traveling up the Miller driveway from Old Kings Landing during the nighttime would be visible from the Guiney Side Yard, particularly if a person in that yard was standing close to the fence (rather than close to the house and lounging area). However, the amount of such light is hard to determine at this point without the design of an actual house and its associated lighting. It remains unclear how much additional light would be shed by a house on the Miller Foundation. In sum, I conclude that while some light emanating from the proposed house may be visible from the Guiney Side Yard or home, that amount is de minimis. 





CONCLUSION 





 For these reasons, I conclude that Guiney has standing under Chapter 240, § 14A to seek a determination of the applicability of the so-called single lot exception to the proposed construction of a house on the Miller Property in the location of the Miller Foundation. Guiney's use of his property would be directly and adversely affected by construction of a such a house setback thirty feet from Harbor Way. While it remains unclear how much light intrusion might result from a such a house, it is evident that the Guiney Property (and particularly the Side Yard) would experience a loss of privacy. Parties to appear for a status conference on September 27, 2021 at 10:00 a.m. to put in place a schedule for resolution of the remaining issues in dispute. 





SO ORDERED.





FOOTNOTES
[Note 1] Note that the photographs of the Side Yard introduced as Trial Exhibits 13(a)-(d) were taken in the summer and autumn of 2017 and 2018, before Miller cleared his property in 2019. Guiney contends that his privacy has been reduced by the clearing of the Miller Property, however, the clearing of Miller's Property is not at issue in this case and Guiney does not claim that Miller unlawfully cleared the trees. Guiney also testified as to the unfettered privacy of the Side Yard before Miller's lot was cleared, however, this testimony is not consistent with other photographic exhibits and my view. As described above, Harbor Lane is visible from the Side Yard as one moves closer to the fence and boundary adjacent to Harbor Lane. While my view took place in the wintertime, when there was little if any foliage from underbrush and deciduous trees, other photographs also support this conclusion. See e.g. Tr. Ex.'s 15(d)-(i) (taken in 2019 and showing Harbor Lane fully visible from the vantage point of an individual standing near the Swing Set and the fence). There are no photographs from this vantage point dating from 2017-2018. 

[Note 2] According to a note on the McKenzie Plan, elevations shown are referenced to the North American Vertical Datum (NAVD) of 1988. Tr. Ex. 9. 

[Note 3] Morse did not prepare an instrument survey of the Guiney Property and instead used Massachusetts GIS information to estimate the elevations in the Side Yard in a similar plan which he prepared, entitled "Proposed Dwelling in Relation to Abutting Lot," dated April 5, 2020 (the "Morse Plan"). The Morse Plan shows the pool deck at Elevation 46 or 47; however, I find this measurement was less accurate and reliable than that of McKenzie who did perform an instrument survey. Tr. Ex. 18. Morse acknowledged during his testimony that the elevations of the Side Yard as shown on his plan were approximate (plus or minus three feet) and not as accurate as McKenzie's elevations. 

[Note 4] Guiney testified at trial that he considered the photograph marked as Tr. Ex. 20(b) to provide "unobstructed view" into his property. I do not credit this testimony and find that Guiney overstated his conclusions about intrusion into privacy. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.